IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TURBOVEN COMPANY**, a Cayman Islands Corporation; **CELESTINO MARTINEZ**, a United States citizen; **ARMANDO MARTINEZ,** a United States citizen; **TIBISAY PULIDO,** a United States citizen; **CLAUDIO DI CERA,** a United States citizen; **FERNANDO GUILLEN,** a United States citizen, and **GREGORIAN INTERNATIONAL INC.,** a Barbados corporation,<br><br>　　*Plaintiffs*,<br><br>v.<br><br>**BRADLEY T. SMITH**, in his official capacity as Director of the United States Department of the Treasury Office of Foreign Assets Control, 1500 Pennsylvania Ave., NW-Annex Washington, D.C. 20220<br><br>　　and<br><br>**U.S. DEPARTMENT OF TREASURY OFFICE OF FOREIGN ASSETS CONTROL**, 1500 Pennsylvania Ave., NW-Annex Washington, D.C. 20220<br><br>　　*Defendants.* | CASE NO. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Turboven Company ("Turboven"), Celestino Martinez, Armando Martinez, Tibisay Pulido, Claudio Di Cera, and Fernando Guillen ("Turboven Officers") and Gregorian International Inc. ("Gregorian") (collectively, "Plaintiffs"), bring this complaint for declaratory relief, declaring that they are not currently engaging in activity that violates Executive Orders 13692 and 13827 or any other similar rule, law or order prohibiting business with the Venezuelan

government, and an injunction barring Defendant Bradley T. Smith and the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") from placing them on the Specially Designated Nationals List ("SDN List"). In support of this complaint, Petitioners allege the following:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Turboven is a corporation organized under the laws of the Cayman Islands.

2. Plaintiff Celestino Martinez is a citizen and resident of the United States and a director of Turboven.

3. Plaintiff Armando Martinez is a citizen and resident of the United States and a director of Turboven.

4. Plaintiff Tibisay Pulido is a citizen and resident of the United States and a director of Turboven,

5. Plaintiff Claudio Di Cera is a citizen and resident of the United States and a director Turboven

6. Plaintiff Fernando Guillen is a citizen and resident of the United States and a director of Turboven.

7. Plaintiff Gregorian International Inc., is a corporation organized under the laws of Barbados. Gregorian is the 50% owner of Turboven.

8. Defendant Bradley T. Smith is the Director of the Office of Foreign Assets Control, U.S. Department of Treasury. He is sued solely in his official capacity.

9. Defendant Office of Foreign Assets Control ("OFAC") is an administrative agency of the United States Department of Treasury, located at 1500 Pennsylvania Avenue NW, Washington, DC 20220. OFAC is responsible for administering and enforcing economic and trade

sanctions against targeted foreign countries and individuals. To accomplish this task, OFAC maintains the SDN List.

10. The Court has jurisdiction under the Mandamus Act, 28 U.S.C. 1361, and the Declaratory Judgement Act, 28 U.S.C. 2201(a), 2202. The Court has jurisdiction over the subject matter of claims pursuant to 28 U.S.C. 1331.

11. Venue is proper in the District of Columbia pursuant to 28 U.S.C. 1391(b) and (e).

## FACTS

12. Turboven Company was incorporated under the Laws of the Cayman Islands in 1998 as a Joint Venture between Public Service Enterprise Group, Inc. (PSEG), a gas, electric, and transportation company from New Jersey, USA existing since 1903, and Corporación Industrial de Energia C.A. (CIE) S.A.C.A, a Venezuelan company existing since 1998. Both founding companies (PSEG and CIE) are publicly traded companies in their respective jurisdictions.

13. On May 29, 1998, Turboven incorporated two special purpose entities in order to develop an electric generation project in the cities of Maracay and Cagua, Aragua State, Bolivarian Republic of Venezuela. These companies are Turboven Maracay Company ("Turboven Maracay") and Turboven Cagua Company ("Turboven Cagua"), both incorporated and existing under the laws of the Cayman Islands.

14. For the development of the business in Venezuela, Turboven Maracay and Turboven Cagua registered to do business in Venezuela.

15. Turboven was authorized by the Venezuelan government to produce and distribute electric power in 1998 according to a decree published in the Official Gazette 5.568E. The company began generating and distributing electricity in 2000, through the above-mentioned

branches – Turboven Maracay and Turboven Cagua, which operate the private businesses in Venezuela.

16. Each energy plant (Maracay and Cagua) has a generation capacity of 60 MW for a total of 120 MW.

17. In January 2007, Venezuelan President Hugo Chavez nationalized the electric industry in the country, and the government began to take over nearly all of the largest energy-producing companies.

18. In 2010, Venezuela's then-President Hugo Chavez approved US$50 million to nationalize Turboven Maracay and Turboven Cagua, but the Venezuelan government never finished the implementation of that plan. Turboven Maracay and Turboven Cagua continued operations as private companies until 2024 when, as set forth below, the businesses and operations were seized for the benefit of the Venezuelan government.

19. In 2012, Gregorian International Inc., a company established in Barbados bought the participation interest of PSEG in Turboven and became the current owner of Turboven together with CIE.

20. Prior to the actions described below, Turboven Maracay and Turboven Cagua continued to be private, independent power producers in Venezuela, generating power from gas for sale to its private clients. Both entities are isolated from the public grid, operate on a completely private grid, have their own customers, and have subscribed private agreements with industrial customers in nearby areas. Turboven Maracay's and Turboven Cagua's provision of electricity directly to private clients and not to or through the Venezuelan government meant that Turboven Maracay and Turboven Cagua did not run afoul of any United States sanctions on Venezuela.

21. On January 6, 2022, Turboven Cagua leased property to one of its clients, MCELD, who utilized the property and the power generated by Turboven to engage in private crypto mining activities. MCELD informed Turboven that MCELD held all appropriate licenses and permissions from Sunacrip (the Venezuelan agency established in September 2020 to regulate cryptocurrency and related activities) to engage in crypto mining and was engaging in permissible operations, as well as all County permits (including the certificate of use and business license).

22. On October 12, 2023, a holiday in Venezuela, MCELD's office and mining facilities were raided by Venezuelan government agencies SEBIN (Venezuela's internal security force and intelligence agencies – which has an extensive record of human rights violations) and PNAC (Venezuela's National Anticorruption Police) with an order to "safeguard and protect" MCELD's assets.

23. MCELD was not allowed back into its facilities and was not notified by any government entity why the government raided its offices and mining facilities and banned it from the premises.

24. Because MCELD was banned from its facilities and operations had ceased, Turboven Cagua suspended electrical service to the facilities for commercial and safety reasons.

25. On November 20, 2023, Turboven Cagua received requests from SEBIN to hand over all legal documentation for Turboven Cagua and demanded by use of force that many of Turboven's employees be questioned at Turboven's office in Maracay.

26. At 11pm on November 23, 2023, SEBIN officers jumped over perimeter walls and broke into the administrative offices of Turboven Maracay's facilities, breaking down doors and emptying drawers searching for information about Turboven Maracay and Turboven Cagua's shareholders and directors in Venezuela. The government agents then threatened to punish

Turboven Maracay and Turboven Cagua's employees if the shareholders and directors failed to show up at the facilities to be arrested. The government agents stole Turboven Maracay and Turboven Cagua's private, proprietary information, including customer invoices, company organizational charts, and other private information to assist the government in its extortion of Turboven.

27. Two and one-half hours later, at 1:30 am on November 24, 2023, after trapping and locking in all personnel in the facilities (including lawyers whom Turboven Cagua had brought in to witness these terrifying events), the government agents presented a document from a criminal judge that stated that the MCELD facilities where under a criminal investigation and therefore the assets of MCELD were temporarily under the custody of the government's SBR (the Venezuelan government's Service of Recovered Assets).

28. As a result of the criminal and terrorizing actions of the government officials, and with great concern for the safety of (and under the threat of physical harm to) Turboven Maracay and Turboven Cagua's personnel and legal counsel, Turboven Cagua agreed to power the MCELD facilities although the Court order was limited to custody and safekeeping of the assets.

29. Thereafter, SEBIN continued to interrogate Turboven Maracay and Turboven Cagua's employees at SEBIN's offices and demand significant proprietary information from Turboven Maracay and Turboven Cagua, including client contracts and invoices, among other private information. Under SEBIN's continued threats, Turboven Maracay and Turboven Cagua cooperated and provided the information requested.

30. On December 14, 2023, Turboven received a letter from Sunacrip. In the letter, Sunacrip stated its intention to continue to operate under the commercial agreements that MCELD

had with Turboven Cagua as of November 23, 2023, the day Sunacrip took over operation of MCELD's facilities

31. On February 21, 2024, Turboven Cagua suspended service on the MCELD account and notified Sunacrip.

32. Due to the level of extortion and threats that had been made to Turboven Maracay and Turboven Cagua, as well as the political turn the dispute had made, Turboven sent formal notice of the action it had taken in the form of letters to the Vice President of Venezuela, the President of Sunacrip, the Minister of Electric Generation for Venezuela (MPPPEE), the President of Corpoelec (the Venezuelan government's electric company), and the SEBIN Maracay office.

33. Later that day, SEBIN's agent contacted a Turboven Maracay and Turboven Cagua representative by phone and demanded that Turboven Maracay and Turboven Cagua send their Operations Superintendent to SEBIN's headquarters for interrogation. SEBIN did not provide any official document seeking the interview of Turboven Maracay and Turboven Cagua's Operations Superintendent.

34. At 5:30 pm on February 21, 2024, SEBIN agents arrived at the Turboven Maracay facilities with the intention to arrest Turboven Maracay and Turboven Cagua's Operations Superintendent and Distribution Superintendent. Because the SEBIN agents failed to produce any legal document authorizing entry and the proposed arrest, the employees did not allow the SEBIN agents to enter the facility. In response, SEBIN's agents closed access to the Turboven Maracay facilities and forcibly searched all personnel who left the facilities.

35. On February 22, 2024, some of the Turboven Maracay and Turboven Cagua employees that had been informally summoned for interrogation by SEBIN, under fear of consequences for not complying with SEBIN's informal demand and fearing that SEBIN would

drag them from their homes if they did not present themselves, ultimately decided to go to SEBIN and were interrogated and threatened there for between 7 and 14 hours. The employees were required to sign summaries of their interrogations before they were permitted to leave.

36. On February 23, 2024, representatives of SEBIN and National Prosecutors Farik Karin Mora and Eddy Alberto Rodriguez Bencomo appeared at Turboven Maracay's offices stating that they were there to perform an audit. Once again, the government representatives failed to provide formal order or other documentation to support such an audit. The government representatives stationed themselves at the office entrance and refused to permit anyone to leave the premises until 11:30 pm. While at the offices, the SEBIN agents collected information from Turboven Maracay's administrative employees and took pictures and videos of the premises, and SEBIN's agents threatened to arrest the administrative and security employees if the electricity service was not restored to MCELD facilities. When the SEBIN agents finally permitted employees to leave at 11:30 pm, they took several employees to SEBIN offices for additional interrogations.

37. On February 23, 2024, SEBIN threatened that, if the electrical service to the MCELD facilities was not reinstated immediately, SEBIN would obtain capture orders and set Interpol red alerts for each of the Turboven Officers seeking relief in this action, who are citizens of the United States. Other Turboven Officers, who were in Venezuela, fled the country within 48 hours in fear of SEBIN's next steps.

38. On March 6, 2024, attorneys who held powers of attorney on behalf of Turboven Maracay and Turboven Cagua were notified that SEBIN was requiring from them a list of all documents related to Turboven and any of the Turboven Officers, including information regarding the attorneys themselves, as well as information regarding the officers' and attorneys' personal

8

addresses. Frightened by the government's intrusive and improper inquiries and concerned for their own safety, Turboven Maracay and Turboven Cagua's attorneys resigned from the powers of attorney, leaving Turboven Maracay and Turboven Cagua defenseless and without legal counsel.

39. On March 15, 2024, agents of SEBIN, Sunacrip, the Public Ministry, the SBR, the National Special Court, and Corpoelec appeared at the Turboven Maracay facility with a letter from a criminal judge, instructing SBR to secure Turboven Maracay and Turboven Cagua assets until a criminal investigation of which the companies allegedly were a part was resolved. Although the pending investigation concerned MCELD, a customer of Turboven Cagua, the Court issued an improper informal letter authorizing the government takeover of Turboven Maracay and Turboven Cagua, separate and completely unrelated entities from MCELD. The government agents demanded to see the Turboven Officers, and they informed the rest of the employees that the officers on the list had been relieved of their duties. The agents declared that Turboven Maracay and Turboven Cagua had new management and that this was the *only change*; that, even though the facilities had been taken over *by the government, Turboven Maracay and Turboven Cagua was still a private company*. The new self-appointed managers of Turboven Maracay and Turboven Cagua are: Igor Gaviria (President), General Carlos Marquez Arias (VP Commercial), Derwin Dumont (VP Administration and Finances), Carlos Velandria (Human Resources Management), and Edgar Delgado (Comptroller).

40. Thereafter, government agents froze all banking activity for Turboven Maracay and Turboven Cagua, as well as the personal accounts for the Turboven Officers and demanded that the Officers "present themselves to justice." The government agents stated informally that the capture orders and Interpol red alerts were in process and that the Officers would have to "face justice."

41. On March 19, 2024, the government's newly-installed Turboven Maracay and Turboven Cagua officers informed all of Turboven Maracay and Turboven Cagua's clients that there had been a change in ownership but did not identify the new owners. They informed Turboven Maracay and Turboven Cagua's customers that they would be provided with new bank account information for the customers to submit payments, and they claimed there were "legal issues" with the old owners. The MPPPEE (Venezuela's Ministry for Electric Generation) sent notifications to Turboven Maracay and Turboven Cagua's banks providing them new authorized signatures on the Turboven Maracay and Turboven Cagua accounts. Thus, the public officers are using the same accounts and are expending the funds in the accounts without any control.

42. On March 20 and 21, 2024, representatives of MPPEE called a meeting with Turboven Maracay and Turboven Cagua's customers to let them know that there was new management and that Turboven Maracay and Turboven Cagua continued to be and would remain private and their contracts would be respected. They sent a letter to Turboven Maracay and Turboven Cagua's customers directing them to use Turboven Maracay and Turboven Cagua's accounts at Banesco (a private financial entity) to make their payments for their monthly invoices. The letter was signed by General Marquez as the new Commercial Vice President of Turboven Maracay and Turboven Cagua.

43. On March 22, 2024, the Venezuelan government took control of Turboven Maracay and Turboven Cagua's bank accounts, supplanting Turboven Maracay and Turboven Cagua's managers' digital identities as well as adding new authorized signatories on the accounts. For example, on March 22, 2024, Turboven Maracay and Turboven Cagua's owners received emails notifying that the administrator access password to Turboven Maracay and Turboven Cagua's Banesco accounts' online access had been changed, as well as the contact information. These

changes had not been originated by Turboven Maracay and Turboven Cagua's rightful owners, who called the bank and were informed that the system indicated they were not the recognized administrators of Turboven Maracay and Turboven Cagua and that they should contact Ygor Gaviria, the newly appointed administrator recognized by the bank's system.

44. Thus, the Venezuelan government took over Turboven Maracay and Turboven Cagua's management, operations, and client relationships. All of this was accomplished by the Venezuelan government pursuant to a presumed preliminary criminal order issued in an investigation involving MCELD and under credible threats of physical harm and criminal sanction through its various agencies and agents.

45. Since that time, Plaintiffs have undertaken efforts to take back control Turboven Maracay and Turboven Cagua. However, recently Plaintiffs have come to understand that the government has taken over control of Turboven Maracay and Turboven Cagua as if it were the permanent owner, taking funds from the companies' bank accounts, selling off assets, and connecting Turboven Maracay and Turboven Cagua's systems directly to supply free energy to government facilities.

46. The Venezuelan government's reprehensible and illegal actions have not only caused (and continue to cause) substantial harm to Turboven Maracay and Turboven Cagua and the Turboven Officers, but also have placed them in a precarious legal position with respect to Executive Orders 13692 and 13827, which generally prohibit doing business with the Venezuelan government, among other applicable laws. Because Turboven Maracay and Turboven Cagua continue to operate as "private" companies, despite their illegal takeover by the Venezuelan government, and because the replacement of the ownership and management of Turboven Maracay and Turboven Cagua were improperly done, Turboven Maracay and Turboven Cagua and the

Turboven Officers are uncertain whether they remain legally responsible for the actions taken by Turboven Maracay and Turboven Cagua under its currently-imposed management and ownership structure.

47. For example, the Venezuelan government's operation of Turboven Maracay's and Turboven Cagua's facilities now appears to include providing energy to the government's grid in violation of United States law. This violates the entire premise under which Turboven was approved to use United States manufacturers' equipment, parts, and support.

48. The current operations also appear to include powering government-owned and government-run crypto mining operations (which the government illegally took from MCELD, as noted above) in violation of United States law.

49. The Venezuelan government appears to now be billing Turboven Maracay and Turboven Cagua clients and accessing Turboven Maracay and Turboven Cagua's financial markets and international supplier list while pretending to operate as a private entity in violation of United States law.

50. Upon information and belief, the Venezuelan government, through Turboven Maracay and Turboven Cagua, has asked for bids from all Turboven international suppliers for parts that are not available to the Venezuelan government due to sanctions. Upon information and belief, the Venezuelan government is attempting to purchase parts for turbines other than the ones owned and operated by Turboven Maracay and Turboven Cagua, using Turboven Maracay and Turboven Cagua to circumvent the sanctions, in violation of United States law.

51. And, the Venezuelan government has taken over Turboven Maracay and Turboven Cagua's and the Turboven Officers' bank accounts and continues to operate the accounts under the private company's and private individuals' names, using the accounts to move funds and

engage in financial transactions in violation of United States law. These accounts, held in different financial institutions, contain Venezuelan local currency (bolivars) and dollars, which are held in sub accounts within those banks.

52. Despite the fact that Turboven Maracay and Turboven Cagua's rightful owners, directors, officers, managers, and employees are no longer in control of Turboven Maracay and Turboven Cagua, they may nevertheless be found by OFAC to be legally responsible for Turboven Maracay and Turboven Cagua's current illegal activities and, thus, are in jeopardy of being found to be committing acts in violation of United States law and, in the case of Turboven and Gregorian, subject to placement on OFAC's SDN list.

53. The Turboven Officers are concerned that the continued illegal operations by the Venezuelan government of Turboven Maracay and Turboven Cagua places the Turboven Officers in jeopardy of being found to be committing acts in violation of United States law.

54. And, because of the opacity of the procedures and investigations undertaken by OFAC prior to listing an entity to the SDN list, as well as the onerous procedures involved in being removed from the SDN list, Turboven and Gregorian are in jeopardy of being deprived of rights and freedoms enjoyed by those entities and individuals who have not been named to the SDN list.

**CLAIM FOR RELIEF**
**Action for Declaratory and Injunctive Relief**

55. Plaintiffs reallege paragraphs 1 through 54.

56. As set forth above, the Plaintiffs are the victims of a ruthless and illegal scheme by the Venezuelan government and its agencies and representatives which resulted in the illegal confiscation of Turboven Maracay and Turboven Cagua's business assets and operations and the Turboven Officers' assets and interest in the companies.

57. In addition, the Venezuelan government continues to operate Turboven Maracay and Turboven Cagua as if they continue to be private companies and is using the companies to circumvent United States sanctions.

58. As a result of the Venezuelan government's illegal actions and continued surreptitious and illegal use of Turboven Maracay and Turboven Cagua's assets, finances, and business information, Plaintiffs are in jeopardy of being found in violation of U.S. law, and in the case of Plaintiffs Turboven and Gregorian, are in jeopardy of being placed on the SDN list.

59. Plaintiffs seek a declaration from the Court that they are not responsible for the current illegal actions being undertaken by the Venezuelan government and its agencies and representatives under the guise of continuing to operate Turboven Maracay and Turboven Cagua as private entities.

60. There is a bona fide, present, practical need for the declaration.

61. The declaration pertains to a present, ascertainable set of facts and controversy among the parties.

62. Plaintiffs' rights are dependent upon the present, ascertainable facts and the law and the Court's application thereof.

63. The relief sought by Plaintiffs is not merely for the purpose of obtaining legal advice from the Court or obtaining answers to questions propounded out of curiosity.

WHEREFORE, for the foregoing reasons, Plaintiffs request final judgment in their favor:

- A. Declaring that none of the Plaintiffs are participating in, nor are they in any way involved with, the illegal activities being undertaken surreptitiously under their names by the self-appointed and illegally installed administrators of Turboven Maracay and Turboven Cagua as a result of the actions of the Venezuelan

government and its agencies and representatives in taking over Turboven Maracay and Turboven Cagua, including the Venezuelan government's i) takeover of all assets of Turboven Cagua and Turboven Maracay for its own use, including using the companies' supplier lists to acquire turbine parts in violation of United States sanctions; ii) billing in Bolivars and US dollars to clients of Turboven Maracay and Turboven Cagua using those companies' local back accounts, allowing the Venezuelan government to have access to international financial markets in violation of United States sanctions; and iii) indiscriminate use of Turboven Maracay and Turboven Cagua assets to energize crypto currency operations owned by the Venezuelan government, and declaring that the Plaintiffs are not legally liable for said illegal activities;

B. Prohibiting Defendants from placing Plaintiffs Turboven and Gregorian on OFAC's SDN list as a result of Turboven Maracay and Turboven Cagua's actions since their illegal takeover by the Venezuelan government and its agencies and representatives; and

C. Granting Plaintiffs the costs of this action and other relief as this Court deems equitable, just, and proper.

Dated: December 27, 2024

Respectfully submitted,

**DAMIAN | VALORI | CULMO LLP**
1000 Brickell Avenue
Suite 1020
Miami, Florida 33131
*Counsel for Plaintiffs*
Telephone: (305) 371-3960
Facsimile:  (305) 371-3965

    Melanie Damian, Esq.
    Fla. Bar No. 99392
    *DC Bar admission pending*
    mdamian@dvllp.com
    Patricia Baloyra
    Fla. Bar No. 78270
    *Pro Hac Vice request forthcoming*
    pbaloyra@dvllp.com

By: /s/ John J. Beins
    John J. Beins, Esq., DC Bar # 426430
    JBeins@beinsgoldberg.com
    Beins Goldberg LLP
    2 Wisconsin Circle, Suite 700
    Chevy Chase, MD  20815
    (240) 235-5040
    (240) 235-5038 (f)